The following was the case, as exhibited by the pleadings and exhibits:
David Myers, late of South Carolina, being seized in fee of certain lands situated in Buncombe County, in this State, by his will, dated 6 June, 1833, devised the same, with the residue of his estate, to his six children, "Mary Clendenning, Clayborn Myers, Elizabeth O'Hanlon, David Myers, Nancy Myers and Robert Myers, for life only, and after their decease to their children respectively, that shall attain the age (348) of 21 years; that is to say, to each of my said children one equal part of my estate (after the payment of my debts and legacies) for life, and after decease of any one of them, to his or her children then living, that may attain 21 years, the income to be applied to their education and maintenance during their minority, but the principal and the accumulation during their minority, to survive to such as may attain 21, and to vest in such, whether one or more, at the age of 21, absolutely and forever." The will then creates cross-remainders between all the children and their issue, upon the death of any of the children without leaving issue, or upon the death of their issue respectively, before attaining 21; providing, finally, that "in case my six children, Mary, etc., should all die without leaving issue, that shall attain the age of 21 years, as before mentioned, then, and in that case, I give all the rest and residue of my estate to my cousin, Henry Myers, his heirs and executors forever."
The testator died, and his will was duly proved in South Carolina, and in September, 1837, David Myers, the son, filed *Page 274 
his bill in the Court of Equity for Buncombe County, against his brothers and sisters, the other devisees with him, and therein stated, that David Myers, the father, was seized of the said land in fee simple, and that, by his will, duly executed to pass land in this State, he devised the same in fee simple to the said David, and to his said brothers and sisters, the parties in the cause, equally to be divided between them as tenants in common. The bill purported to have annexed to it, as an exhibit, a copy of the said will certified from the proper courts in South Carolina, where it alleged the original to have been duly proved and to remain. The bill then stated that actual partition could not be made of the said land in Buncombe without injury to all the owners, and prayed, therefore, that the same might be sold by a decree of the Court, and the money divided between the persons entitled, according to the statute.
The defendants did not answer the bill, but suffered it to be takenpro confesso; and such proceedings were had in the suit, that in September, 1838, a decree was entered, purporting to be made by (349) the Court on a hearing upon the bill, exhibits, and former orders, and decreeing that the land should be sold, as prayed for in the bill, and appointing the Clerk and master to make the sale to the highest bidder, upon a credit of one and two years, taking bonds from the purchaser with sufficient sureties.
On 12 February, 1839, the master made a sale to the defendant, Philip Brittain, for the sum of $5,656, which was duly secured, and he gave Brittain a written certificate stating the sale and the terms thereof, and he also reported the same to March term, 1839, and the report was confirmed and Brittain went into possession of the land.
In fact, however, a copy of the will was not exhibited with the bill, nor given in evidence on the hearing, nor filed in the cause, until January or February, 1840.
The master being ordered to collect the purchase-money, he received from Brittain the sum of $1,250, in April, 1840, and took judgment for the residue; and Brittain, being unable to pay it conveniently, without selling the land, agreed for the sale thereof to James M. Smith, on 28 February, 1842, at the price of $3,800, ready money, which was to be, and was, immediately applied towards the payment of the debt, and then Brittain discharged the residue. The contract between Brittain and Smith was written on the certificate, which had been given by the master to Brittain, and states that, in consideration of the sum of $3,800, paid to Brittain, he had bargained and sold to the said Smith "the lands within named, and doth hereby *Page 275 
transfer and assign to said Smith all my interest and right in and under this certificate, and authorize and request the honorable court of equity to make a title to the premises to the said Smith in my stead."
At March term, 1842, the master reported that the purchase-money was fully paid to him. And it was thereupon ordered that the master should execute a deed to James M. Smith, "the assignee or Philip Brittain, the original purchaser." And it was further ordered that the master should retain the purchase-money, and let it out on loans, bearing interest, until the further order (350) of the Court. In May, 1842, James M. Smith filed his bill against all the parties to the above mentioned suit, and against Brittain, and therein states all those matters, and that Brittain, when he purchased, and when he sold to Smith, and also, that Smith, when he purchased and obtained the order, that the deed should be made to him, fully believed that the parties to the original suit were seized in fee as in the bill stated; and that he knew nothing to the contrary until within a few days before the filing of his bill, when he discovered the contents of the said will, and was advised that he could not get a good title under the decree.
The bill charges that the statement of the title in the original suit, and the keeping back the will from the Court, and procuring and suffering the decree without defense, were fraudulent, and with a design to impose on the Court and deceive purchasers. The prayer is, that the decrees in the original cause may be reversed, and the sale declared void, and the purchase-money aforesaid, and the interest thereon, be paid to the plaintiff.
Upon the filing of this bill, the Court ordered, in the original cause, that the master should lease the land from year to year pending this suit, and bring the rent into court.
Brittain, by his answer, submits that Smith should have the money paid by him, Smith; but, he says, that, at the time of his sale to Smith, he was ignorant of any equity to rescind his contract of purchase upon the ground of a defect of title, but believed the title to be good, and the contract obligatory, and that, under that belief, he sold the land for less than he gave, from necessity; and, upon those grounds, he claims for himself such parts of the purchase-money as he paid out of his own funds, over and above the sum of $3,800, received from Smith.
All the Myers family, except two, suffered the bill to be taken proconfesso; and those two answered and denied their belief of any fraud intended in the original suit. They state *Page 276 
that real estate in South Carolina had been sold by a (351) decree of the court of equity, in the same manner as prayed in the bill here, and that they were advised that a good title could be made.
They state further, that the land had fallen much in value since the sale to Brittain, and that they believe that is the plaintiff's motive for wishing to get clear of the bargain, and that they had offered him to refund to him the sum of $3,800, which he paid, and take the bargain in his stead, or to execute to him a covenant with the most ample security to indemnify him against any disturbance, and also to complete the title.
To the answers, replication was taken; and the cause was set down for hearing upon the foregoing orders, and the record of the original suit, and the orders therein, and a copy of the will of David Myers, as exhibits, and an admission of the truth of all the allegations in the bill, except those especially denied, and then it was transferred to the Supreme Court for a hearing.
A sale by the master in a case of this kind is but a mode of sale by the parties themselves. It is not merely a sale by the law, in invito, of such interest as the party has or may have, in which the rule is caveat emptor, but professes to be a sale of a particular estate, stated in the pleadings to be vested in the parties, and to be disposed of for the purpose of partition only. Therefore, if there be no such title, the purchaser has the same equity against being compelled to go on with his purchase, as if the contract had been made without the intervention of the Court; for, in truth, the title has never been judicially passed on between persons contesting it. Hence, if a purchaser pays his money on a master's sale and discovers a defect in the title, at any time before a conveyance executed, he may recover it back. Sugd. Vend., 345. Johnson v. Johnson, 3 Bos. 
Pul., 162.
There is no question as to the want of title in this case. Although the estate of the parties to the partition cause (352) was stated to be a fee simple in possession, yet it is but a life estate. It is true, they would be allowed to complete the title, if they could. But, that is seen to be impossible, for the limitations over are contingent to persons not yet born, and it can not be determined who will be entitled to the fee in the premises until the death of every one of these *Page 277 
persons and twenty-one years afterwards — since the ultimate limitation is to the testator's cousin Henry and his heirs, upon the event, that all his own children should die without leaving a child that shall attain the age of twenty-one.
We are not prepared to say that it is material whether there be simply the defect of title pointed out, or whether there was a deception intended by the parties to the suit upon that point. But we think that nothing less than such a fraud can be judicially inferred from the facts. It is expressly charged in the bill, and is not controverted by four out of the six parties to the former suit; and the other two only answer to their belief of the motives of those who did manage the case. They state, indeed, a construction put on this will by the courts of South Carolina; but they have offered no evidence of the truth of that statement. We are very sure they could offer none such, for the construction of the will is so clear that no such respectable tribunal, as that mentioned by them, could have so held. Then there concur both the suggestio fulsi in the bill as to the title, and suppressio veri by withholding the will and by the omission of the defendants to file an answer or to make defense; and they constitute, upon legal principles, nothing less than a fraud. It is obvious that the intention was to get a decree without an oath being taken by any person, and to obtain evidence to the assertion of a good title by presenting it to the public, with the apparent sanction of judicial authority.
The purchaser can not, therefore, be compelled to complete the purchase, but the sale must be set aside.
This conclusion was not disputed at the bar; but the controversy turned upon the effect of that declaration on the right to the purchase-money. The plaintiff claims the whole of it; but both of the other parties deny his right to more than he paid, though they dispute between themselves, which of (353) them is entitled to the residue. We think, upon investigation, that neither Myers nor Brittain has the right to it, and, therefore, that it belong to the plaintiff.
This question, it is to be remembered, arises in the court of equity, and it is, in the first instance, what equity have the Myers' to any part of this fund? We think that they have plainly none at all. Ordinarily, when the vendor can not make a good title and the contract is rescinded, the parties are put in statu quo. If the vendor has paid no part of the purchase-money, that is effected simply by declaring that the contract is rescinded. In such a case it was never heard that the vendor had an equity against the vendee to say, "you agreed to give me more for the land than it was worth, at the time of the *Page 278 
sale — or rather it is now worth — and therefore you ought to pay me all the price agreed on beyond the present value of the land." For the question is not one of compensation or damages, but of specific performance. The purchaser agreed to give so much money for the land, if conveyed to him with a good title; and unless the vendor does that, the vendor can in equity get nothing from the other side, whatever might be the rule of law as to damages, if the vendee were to sue the vendor at law on his covenant to convey, or whatever may be the rule of equity as to compensation for a part of the land, for which a good title can not be made, when the vendee is content to take a conveyance for the part to which the title is good. But when the vendee declines taking a conveyance, and the Court holds that the title to the whole is defective, the contract is set aside, and the vendor can claim no part of the purchase-money for any difference in value. The same equity, precisely, compels the vendor to pay back such part of the purchase-money as he may have received. For the receipt of the purchase-money makes no difference, unless the purchase has been completed by the vendee's accepting a conveyance, or doing some other act which precludes him from asking for a good title or an inquiry into it. Then, it is apparent, that if Smith were out of the case, and Brittain and Myers alone were (354) parties, the latter could have no equity against Brittain, as to any part of this money, whether it be considered as having been paid to Myers or still in Brittain's hands, or in custodia curiae. All sides agree, indeed, that the whole fund would be decreed to Brittain had he never sold to Smith. But Myers says that Smith can recover no more from him than he, Smith, paid; that such would be the measure of damages at law, if the parties had respectively made deeds with warranty, and that equity must follow the law. It is to be observed that, in setting up this claim, Myers necessarily excludes Brittain from any share of the money. He does so properly, upon the supposition that the case is to be considered analogous to the case of warranties at law; for Brittain, as the immediate vendee, could not recover from Myers on this warranty to himself, after his sale to Smith. Markland v. Crump, 18 N.C. 94. Then why is Brittain to be excluded from any share of this money, as contended for by Myers? Certainly because he assigned his whole interest in the subject-matter to Smith. That is Myers' argument. Now, does it not follow, if Brittain is to be excluded by Myers from this fund because he has assigned it to Smith, that by that assignment Smith necessarily succeeds *Page 279 
to it? He would not be Brittain's assignee, unless he took all that Brittain could claim. The effect of the assignment in equity is, indeed, not precisely the same with conveyances at law. In equity the assignee stands absolutely in the place of his assignor, and it is the same, as if the contract had been originally made with the assignee, upon precisely the same terms as with the original parties. For example, if Myers could make a good title, the conveyance, as things stands, should be made by Myers directly to Smith in consideration, not of the sum paid by Smith to Brittain, but of $5,656 paid by Brittain to Myers, and then, even upon the rule of damages on warranties established inWilliams v. Beeman, 13 N.C. 483, Smith would recover from Myers the whole price received by him. The rule of that case was much discussed in the argument, and its incongruity with previous cases and with itself, as applied to different states of facts, was much insisted on; and perhaps it may hereafter be found impossible (355) to carry out the doctrine fully. But, at present, we do not disturb that case; for, as before said, this is not a question of damages at law, but it is purely an inquiry, what rule the court of equity has adopted, as to the purchase-money, when the contract can not be completed, and what effect the Court gives to an assignment of an equity. Now, we have seen that Brittain would be entitled to the whole of this fund against Myers, and that he assigned his purchase to Smith. Does not that, asagainst Myers, put Smith in Brittain's shoes? Why not? Myers says, because he only paid $3,800. Admit it; but that is nothing to Myers. Suppose he had paid nothing for it, but that Brittain had devised it to him or assigned it to him, as an advancement to a son. Could Myers contend that, therefore, he
was to keep the whole purchase-money and, at the same time, not convey the land? It would be monstrous, if it were so. There is no doubt that Smith has all the rights of Brittain in the premises. He is his assignee, and as much entitled to specific performance by a conveyance of the land bought by him; and if he can not get that, which he claims, because Brittain could claim it — then he has a right to the money, as belonging to him, because it would have belonged to Brittain. Smith is not restricted to the sum paid by him. He stands in Brittain's shoes, as to his liabilities, and he is therefore entitled to his privileges. Suppose Brittain had paid none of the purchase-money, Smith would have been bound to pay the whole to Myers; for the purchase of an equitable title takes it, subject to all prior equities. Winborn v. Gorrell, ante, 117. King v. Lindsay, ante, 77. Here, indeed, Brittain has been in *Page 280 
possession for three years or more; and there is no doubt that Smith must account for that to Myers. If he bears Brittain's burdens, then he must be entitled to his advantages. As we have already said, it is nothing to Myers how Brittain and Smith dealt. Suppose Smith had given Brittain $10,000 for his interest, yet he could have claimed from Myers only the sum which Brittain had paid, and in like manner he (356) is entitled to that, though he paid Brittain less. Smith may not be entitled to recover from Brittain more than he paid him, or even anything, and yet he is entitled to the whole from Myers; for the latter is liable to no one else, and can not in good conscience keep a sum of money, which, by fraud, they obtained for land which they can not convey.
This brings us to the question between Smith and Brittain. Now, we do not perceive any right remaining in Brittain, nor any ground whatever on which he can set up a claim for any part of the money. He assigned his whole interest to Smith, and put himself out of the case. It is plain that Smith and Myers might deal with each other as they pleased, without consulting Brittain. If Smith chooses, he may now take a conveyance from the master, and then the money would belong to Myers. Or they two might take out the money and modify their contract as they choose. Now, that they could not do, if Brittain had an interest. Brittain's claim is founded on the supposed hardship of his losing the money, which he paid, when his assignee does not get the land. But that is a hardship which arises solely from his having agreed to give too much for the land, or its falling in his hands. It is not a hardship growing out of a rule of equity, or for which any rule of equity furnishes a remedy. If he had given the land to his son, the latter, and not he, himself, would call for the money from Myers. It is simply the effect of an assignment, as sustained by the court of equity. As before observed, even if the Court, instead of decreeing upon its own principles of specific performance, were to decide in analogy to the rule of law respecting warranties, Brittain could not recover one cent from Myers. Markland v. Crump, 18 N.C. 74.
Therefore, the money must either be recovered by Smith, or kept by Myers; and, between them, the equity is already disposed of. It is said, indeed, that the decree is, that the contract shall be set aside, and that the consequence of that is, that the parties are to be put instatu quo, by which Myers will keep the land, and each of the other parties take the money paid by him. But that goes plainly on a (357) fallacy. The contract for the sale of the land is not enforced, and, *Page 281 
therefore, the vendor must give up the purchase-money. But it is not considered that, in truth, it never was made; for, if so, there would be no ground for decreeing the repayment of the money received under it. Moreover, the assignment from Brittain to Smith is not rescinded; and whilethat stands, it excludes Brittain from all right in the premises, whatever may be the equities of the other parties between themselves. Indeed, the only necessity for making Brittain a party in this cause, was to have the assignment established against him, as Myers had a right to require should be done. And, but for his claim to a part of the money, he would be entitled to his costs.
It is next said that this bill ought not to be entertained, because all the objects of the plaintiff could have been attained by a petition in the first cause, and that there can be no decree in this cause to reverse the decree in that. The first part of the objection only goes to the costs of this suit, and is a good reason why the present plaintiff should not recover his costs. But we do not see why the Court may not decree, at the suit of this plaintiff against all the parties to the original suit, that they should, among themselves, take such steps in that suit, that the decree obtained therein by their fraud, declaring them to be owners in fee, and decreeing a sale of the land, should be reversed. But even if that can not be done, and we do not think it necessary to decide, in this case, that it can, there seems to be no objection to a decree against those parties, that they shall permit the present plaintiff to receive the money heretofore paid into court, in that case, upon his agreeing, in court, to accept the same instead of a conveyance of the land, and that the orders may be set aside, whereby the sale made by the master was confirmed, and he required to make a deed to the plaintiff. That far, the bill is not founded on any error in law in the first cause, but upon the mere fraud of the parties in that cause on the Court, and on the plaintiff as a purchaser.